United States District Court
Southern District of Texas
**ENTERED**
September 02, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| VALERIE LOY, On Behalf of HERSELF and All Others Similarly Situated, | § § § § | |
| Plaintiffs, | § § | |
| VS. | § | CIVIL ACTION NO. 7:18-cv-00004 |
| REHAB SYNERGIES, LLC, | § § § | |
| Defendant. | § | |

## OPINION AND ORDER

The Court now considers "Defendant's Motion to Exclude the Testimony and Report of Liesl M. Fox, Ph.D. Pursuant to Daubert and Rule 702;"[1] Plaintiffs' response;[2] and Defendant's reply.[3] The motion is ripe for consideration. Upon consideration of the motion, the record, and relevant authorities, the Court **GRANTS** Defendant's motion.[4]

### I.  BACKGROUND AND PROCEDURAL HISTORY

This is a Fair Labor Standards Act ("FLSA")[5] case concerning "off-the-clock" work allegedly performed by Plaintiffs and other therapists[6] while working for Defendant, a skilled nursing provider with approximately forty-four locations throughout the state of Texas.[7]

---

[1] Dkt. No. 61.
[2] Dkt. Nos. 69.
[3] Dkt. Nos. 73.
[4] Dkt. No. 61.
[5] 29 U.S.C. § 201 et seq.
[6] Speech Language Pathologists (SLPs), Physical Therapists (PTs), Physical Therapy Assistants (PTAs), Registered Occupational Therapists (OTRs), and Certified Occupational Therapy Assistants (COTAs).
[7] Dkt No. 1 p. 2, ¶ 12; Dkt. No. 33 p. 2, ¶ IA. It is somewhat unclear from the pleadings the number of facilities Defendant currently maintains. Defendant indicates there are 50 or 51 locations in its response. *See* Dkt. No. 33 pp. 23–24.

Named Plaintiff Valerie Loy was employed by Defendant from March 2014 to August 2016 at its facility in McAllen, Texas.[8] On January 5, 2018, she filed suit in this Court alleging that she, and other similarly situated therapists, worked "off-the-clock or otherwise underreported their time" while employed by Defendant.[9] Plaintiffs further allege that this off-the-clock work occurred as a result of the "onerous productivity requirements" set by Defendant.[10] Plaintiffs also allege that Defendant knew off-the-clock work was occurring and "expressly encouraged it."[11] As a result of this practice, Plaintiffs allege they have been "denied overtime payments that they are due" in violation of the FLSA.[12]

This case was certified as a collective action under 29 U.S.C. § 216(b) on April 3, 2019.[13] After certification, there were a total of fifty Plaintiffs in this case—one named Plaintiff and forty-nine opt-in Plaintiffs.[14] Plaintiffs' expert, Dr. Liesl M. Fox, Ph.D. purports to calculate the amount of damages for uncompensated overtime performed by Plaintiffs.[15]

Defendant filed the present motion to exclude the report and testimony of Dr. Fox.[16] The motion is now ripe for consideration. The Court turns to its analysis.

---

[8] Dkt. No. 1 p. 2, ¶ 8.
[9] Dkt. No. 1 p. 3, ¶ 13.
[10] *Id.*
[11] *Id.*
[12] *Id.* ¶¶ 15–17.
[13] Dkt. No. 35.
[14] *See* Dkt. Nos. 21–22; 26; & 40–48 (Notice of Consent forms signed by ReAnna McNames; Nancy N. Garcia; Sophia Silva; Kathryn Campbell; Michelle Cole; Jeremy P. Lawson; Mardel Hollie Weger; Wendy Adamo; Cara Bradford; Sharon G. Burns; Mary Camposano; Lana Crenshaw; Ryan Degerstrom; Holly Gates; Chavita Green; Deunta Jenkins; Angela La Manna; Jameson Lee; Eyvonnia McCrary-Taylor; Sheena McLaurin; Lanita Meadows; Paul Mendiola; Jennifer Mensah; Marsha Moneyheffer; Trislyn Palmer; Mattie L. Rogers; Debra Smith; Jorgina Tamplen; Courtney Warren; Colette K. Boyd; James Chambers, Jr.; Lula Gordon; Ricardo Macias; Todd Piatt; Mary Picardi; Leigh A. Strolis; Veronica Zubowski; Mindy Barry; Tracy Nolan; Taryn Trason; Keri Johnson; Ballah Burch; Rhianna Acheson; Vannoy Lin Reynolds; Julie Hildebrandt; Donald Chapa; John Swanson; Robert Scott; David Brent Little).
[15] Dkt. No. 69-2 at 3.
[16] Dkt. No. 61.

## II. Motion to Exclude

In Defendant's motion to exclude, it requests the Court exclude the testimony and report of Plaintiffs' expert Liesl M. Fox, Ph.D.[17]

### a. Legal Standard

"[T]he Federal Rules of Evidence control the admission of expert testimony."[18] The Rules and judicial scrutiny extend to all experts, whether scientific or otherwise.[19] When an expert's "factual basis, data, principles, methods, or their application" are sufficiently called into question,[20] the Court must undertake a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."[21] The Court must first determine, under Federal Rules of Evidence 104(a) and 402, that the expert's proposed testimony is relevant and would assist with determining a fact at issue.[22] Evidence that is not both is not admissible.[23] "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful. Similarly, low probative value, or a total lack of it, will render proposed expert testimony unhelpful and, therefore,

---

[17] Dkt. No. 61 at 1.

[18] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459 (5th Cir. 2002).

[19] *Rodriguez*, 242 F.3d at 580–81 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

[20] *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 581 (5th Cir. 2001) (quotation omitted).

[21] *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592–93 (1993).

[22] *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) (quoting *Bocanegra v. Vicmar Servs.*, 320 F.3d 581, 584 (5th Cir. 2003)) (rejecting conclusory testimony as irrelevant); *cf. United States v. Gluk*, 831 F.3d 608, 615 (5th Cir. 2016) (reversing the exclusion of SEC investigators' evidence); *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (alteration and quotation omitted) ("The contradictions coupled with the lack of support for the statements take them out of the realm of substantive evidence. In the context of admissibility of expert testimony, this court has noted that if an opinion is fundamentally unsupported, then it offers no expert assistance to the jury."); *Pedraza v. Jones*, 71 F.3d 194, 197 (5th Cir. 1995) (cleaned up) ("To qualify as an expert, the witness's testimony must both rest on a reliable foundation and be relevant to the task at hand.").

[23] *Perez v. Tex. Dep't of Crim. Just., Inst. Div.*, 395 F.3d 206, 210 (5th Cir. 2004) (citing Fed. R. Evid. 401).

inadmissible under Federal Rule of Evidence 702."[24] The Court scrutinizes proposed expert testimony more searchingly than lay witness testimony for its pertinency and potential prejudice.[25]

Additionally, "[u]nder the Rules[,] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[26] "Experts qualified by knowledge, skill, experience, training or education may present opinion testimony to the jury"[27] only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[28] The proponent of the proffered expert testimony "must prove by a preponderance of the evidence that the testimony is reliable" and cannot rest on generic assurances.[29] Under the first element, "the existence of sufficient facts . . . is in all instances mandatory."[30] "[A] district court has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion."[31] Unsubstantiated factual

---

[24] 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 702.02[5] (Mark S. Brodin, ed., 2d ed. 1997) (cleaned up), *quoted in Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 591 (1993); *see EEOC v. U-Haul Co. of Tex.*, No. 4:04-cv-3788, 2005 WL 2860987, at *2 (S.D. Tex. Nov. 1, 2005) (Hittner, J.) (quoting *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000)) ("Expert testimony assists the trier-of-fact when the expert's knowledge and experience on a relevant issue are beyond that of the average juror and the testimony helps the trier-of fact understand the evidence or determine a fact issue. When the jury is equally competent to form an opinion about the ultimate fact issues or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony.").

[25] *Rule 702 of the Federal Rules of Evidence Is Sound; It Should not be Amended*, 138 F.R.D. 631, 632 (1991) (Weinstein, J.), *quoted in Daubert*, 509 U.S. at 595. *But see Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case . . . where a district judge sits as the trier of fact in place of a jury.").

[26] *Daubert*, 509 U.S. at 589; *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quotation omitted) (holding the Rules "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

[27] *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quotation omitted). *But see Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623–24 (5th Cir. 2018) (cleaned up) ("Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Although an expert's qualifications may be less-than-sterling, she may still be certified. This is because differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.").

[28] *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (quoting FED. R. EVID. 702).

[29] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

[30] *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

[31] *Knight v. Kirby Inland Marine Inc*., 482 F.3d 347, 354 (5th Cir.2007).

assertions will bar expert testimony,[32] as will "altered facts and speculation designed to bolster [the proponent's] position."[33] Expert opinions that are unsupported, self-contradicted, or assumptive are to be excluded.[34] However, the proponent "need not prove the testimony is factually correct, but rather need only prove by a preponderance of the evidence the testimony is reliable"[35] and the Court should "approach its inquiry with the proper deference to the jury's role as the arbiter of disputes between conflicting opinions."[36] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[37] Indeed, the Fifth Circuit has cautioned against transforming a motion to exclude an expert into a trial on the merits, because the factfinder may be entitled to accept or reject an expert's testimony *including* by judging whether the predicate facts on which an expert relied are accurate.[38] Generally, cross-examination and presentation of competing evidence are traditionally sufficient to challenge an expert opinion, rather than exclusion for inadmissibility.[39] In short, experts may rely on disputed facts,[40] but not

---

[32] *Id.* at 319 & n.4.

[33] *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996); *see Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) (citing *MGM Well Servs. v. Mega Lift Sys.*, No. 4:05-cv-1634, 2007 WL 150606, at *4 (S.D. Tex. Jan. 16, 2007) (Atlas, J.) ("Rather than conduct and report the results of critical, independent analysis, it appears that Alworth relied heavily, if not exclusively, on what Bartley told him. His expert report is at best an effort to synthesize Defendant's positions and present them summarily as an expert opinion.")) ("Although in forming an independent opinion an expert can rely on information provided by a party's attorney, an expert cannot forgo his own independent analysis and rely exclusively on what an interested party tells him.").

[34] *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005).

[35] *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

[36] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

[37] *United States v. 14.38 Acres of Land, more or less Situated in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo*, 826 F.2d at 422); *see* FED. R. EVID. 702 advisory committee's note to 2000 amendment ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").

[38] *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).

[39] *See MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 852 (5th Cir. 2015) (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 596 (1993)); *see 14.38 Acres of Land*, 80 F.3d at 1078 ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.").

[40] *Metro Hosp. Partners, Ltd. v. Lexington Ins. Co.*, No. 4:15-cv-1307, 2017 WL 3142444, at *6 (S.D. Tex. July 25, 2017) (Rosenthal, C.J.) (citing *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (per curiam) and *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004)); *i4i Ltd. P'ship v. Microsoft Corp.*,

unsubstantiated assertions.[41] An opinion based on "insufficient, erroneous information," fails the reliability standard.[42]

Under the second and third elements for assessing expert evidence, "expert testimony 'must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*.'"[43] "Under *Daubert*, 'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'"[44] To test reliability, the Court assesses the intellectual rigor of the proposed expert testimony,[45] which must be validated by an independent and objective source beyond the expert's assurances,[46] and the Court "should ensure that the [expert] opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of [the] discipline,"[47] but an expert report or opinion need not be in lockstep with the common or

---

598 F.3d 831, 856 (Fed. Cir. 2010) (citing *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) and *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002)) ("[I]t is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony. Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury. The jury was entitled to hear the expert testimony and decide for itself what to accept or reject."), *aff'd,* 564 U.S. 91 (2011).

[41] *See Knight, supra* note 31.

[42] *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) (affirming exclusion of expert opinion that relied on false assumptions rebutted by undisputed record evidence).

[43] *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 166 F. Supp. 3d 654, 662 (E.D. La. 2016) (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007)).

[44] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 n.10 (5th Cir. 1998) (omission in original) (emphasis deleted) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).

[45] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

[46] *Brown v. Ill. Cent. R.R.*, 705 F.3d 531, 536 (5th Cir. 2013) (quoting *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc)); *see Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (alteration and quotation omitted) ("But the existence of sufficient facts and a reliable methodology is in all instances mandatory. Without more than credentials and a subjective opinion, an expert's testimony that "it is so" is not admissible.").

[47] *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997) (second alteration in original) (quotation omitted); *see McManaway v. KBR, Inc.*, 852 F.3d 444, 449 (5th Cir. 2017) (cleaned up) (holding that courts "look to the basis of the expert's opinion, and not the bare opinion alone. A claim cannot stand or fall on the mere *ipse dixit* of a credentialed witness."); *cf. Mayor of City of Phila. v. Educ. Equal. League*, 415 U.S. 605, 621 (1974) ("[T]he

prevailing standard to be admissible.[48]  Similarly, the Court should exclude expert evidence if the witness is not qualified in a particular field or subject,[49] but an expert witness need not be highly credentialed or qualified to offer an expert opinion to the factfinder.[50]  The Court may "conclude that there is simply too great an analytical gap between the data and the opinion proffered" to be admissible,[51] but there is no definite formula for determining whether expert testimony is reliable or unreliable "and the court must judge admissibility based on the particular facts of the case."[52] "Certain more specific factors, such as testing, peer review, error rates, and 'acceptability' in the relevant scientific community . . . might prove helpful in determining the reliability of a particular scientific 'theory or technique.'"[53]  Reliance on studies that do not support a contention, cherry-picked data, or a dubious methodology may be grounds to reject expert testimony.[54]  "Trial judges retain 'broad latitude' both in deciding how to determine whether an expert's testimony is reliable, and ultimately, whether the testimony is, in fact, reliable."[55]

---

District Court's concern for the smallness of the sample presented by the 13-member Panel was also well founded.");
*accord Conlay v. Baylor Coll. of Med.*, 688 F. Supp. 2d 586, 595 (S.D. Tex. 2010) (Smith, J.) (collecting cases).
[48] *Whitehouse Hotel LP v. Comm'r*, 615 F.3d 321, 332 (5th Cir. 2010) (rejecting the argument that compliance with uniform published professional standards goes to admissibility rather than credibility); *see Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 588 (1993) ("Nothing in the text of this Rule establishes 'general acceptance' as an absolute prerequisite to admissibility."); *Hardy v. United States*, 141 Fed. Cl. 1, 32 (2018) ("The Yellow Book [Uniform Appraisal Standards for Federal Land Acquisitions] applies only to appraisers hired by the federal government for condemnation purposes; it is not mandatory with respect to appraisers not hired by the government.").
[49] *See Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (affirming exclusion of expert evidence because "Moore is not a tire expert. He has never been employed in any capacity dealing with the design or manufacture of tires. He has never published any articles regarding tires nor has he ever examined a tire professionally prior to this litigation. His only experience with tires is as a consumer.").
[50] *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199–200 (5th Cir. 2016).
[51] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see id.* ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").
[52] *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 379 (5th Cir. 2010).
[53] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593–94 (1993)).
[54] *Burst v. Shell Oil Co.*, 650 F. App'x 170, 174 (5th Cir. 2016) (per curiam).
[55] *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (5th Cir. 2006) (quoting *Kumho Tire Co.*, 526 U.S. at 142).

### b. Analysis

In Defendant's motion to exclude, it argues that the Court should exclude the testimony of Plaintiffs' expert Dr. Liesl M. Fox, Ph.D. (Dr. Fox) because (1) it is not based on sufficient facts or data, (2) it is not the product of reliable principles and methods, (3) she did not reliably apply the principles and methods to the facts of the case, and (4) her report will not assist the jury in understanding the evidence.[56]

In preparing her report and testimony, Dr. Fox merged three data sources: (1) Defendant's payroll records, (2) Defendant's time keeping records, and (3) a spreadsheet created by Plaintiffs' counsel listing an estimation of off-the-clock hours worked by each Plaintiff.[57] With this information, Dr. Fox calculated the estimated total hours worked by each Plaintiff each week; the estimated amount of weekly unpaid overtime worked by each Plaintiff, if any; and estimated damages.[58]

As the sole source for data on Plaintiffs' estimated unrecorded off-the-clock work, Dr. Fox relied on the spreadsheet[59] created by Plaintiffs' counsel.[60] Plaintiffs state that "Dr. Fox's report is based upon estimates contained in verified and sworn interrogatory responses for 38 Opt-In Plaintiffs and sworn deposition testimony of the five original Plaintiffs who joined the case prior to the Court's decision on class certification" and "sworn testimony elicited by Defendant itself."[61] However, Dr. Fox did not review Plaintiffs' interrogatory responses or depositions to make her calculations.[62] Additionally, though in her report, Fox states that "estimates of time worked off-

---

[56] Dkt. No. 61 at 5, 8, 12, & 15.

[57] Dkt. No. 69-2 (Fox Second Amended Report); Dkt. No. 69 at 5; Dkt. No. 69-6 at 41, Fox Dep. 39:9–19; *see* Dkt. No. 61-7 (spreadsheet).

[58] *Id.*; Dkt. No. 69-2.

[59] Dkt. No. 61-7.

[60] Dkt. No. 61-6 at 33, 38, 40–41, 61, & 70, Fox Dep. 31:3-7; 36:12–14; 38:4–8; 39:5–19; 59:13–14; 68:9.

[61] Dkt. No. 69 at 2.

[62] Dkt. No. 61-6 at 40–41, Fox Dep. 38:4–8 & 39:5–8; s*ee* Dkt. No. 69-2 at 4.

the-clock were provided by 42 plaintiffs,"[63] she clarifies in her deposition that she relied solely on the spreadsheet created by Plaintiffs' counsel for information regarding Plaintiffs' off-the-clock hours.[64] In light of this, the Court now turns to determine whether the spreadsheet created by Plaintiffs' counsel reliably reflects the estimates provided by Plaintiffs in their sworn interrogatories and deposition testimony.

   *1. The Spreadsheet*

Plaintiffs state that they "distilled the estimates of off the clock work contained in these sworn discovery responses into a spreadsheet that was provided to Dr. Fox and produced in the litigation."[65] However, upon review of the spreadsheet,[66] the Court notes several concerning inconsistencies between Plaintiffs' sworn interrogatory responses and deposition testimony and the numbers listed in the spreadsheet. While in some cases, the listed numbers not reflective of the full extent of Plaintiffs' estimates, in others they appear to be outright fabrications. The Court outlines some particularly concerning examples below.

- In his interrogatory response, Plaintiff Todd Piatt provided that he worked an "average of 2 hours per *week*;"[67] however in the spreadsheet the estimate for Plaintiff Piatt is listed as two hours per *day*.[68]

- In her interrogatory response, Plaintiff Mary Picardi states that she "worked off the clock around *2 hours per week* but this amount fluctuated and was not always consistent."[69] The spreadsheet lists her "off-the-clock estimate" as 0.5 hours per *day*.[70]

---

[63] Dkt. No. 69-2 at 5.
[64] Dkt. No. 61-6 at 33, 38, 40–41, 61, & 70, Fox Dep. 31:3-7; 36:12–14; 38:4–8; 39:5–19; 59:13–14; 68:9.
[65] Dkt. No. 69-2 at 5
[66] Dkt. No. 61-7.
[67] Dkt. No. 61-1 at 159, ¶ 1 (emphasis added).
[68] Dkt. No. 61-7 at 2.
[69] Dkt. No. 61-1 at 165, ¶ 1.
[70] Dkt. No. 61-7 at 2.

There is no information regarding the basis of or method for calculating this 0.5-hour daily estimate.

- Plaintiff Mardel Hollie Weger, listed as Hollie (Mardel) Weger on the spreadsheet, stated in her interrogatory response that she "estimates that she worked off the clock on average two or three days per week, and she estimates that the total amount of time she worked off the clock was between three or four hours per week."[71] However, the spreadsheet lists her "off-the-clock estimate" as 0.75 hours per day.[72] There is no information regarding the basis of or method for calculating this 0.75-hour daily estimate.

- Plaintiff Kathryn Campbell testified in her deposition that she worked an average of four to five hours off the clock per week,[73] while the spreadsheet listed her "off-the-clock estimate" as one hour per day.[74]

- Plaintiff Nancy Garcia testified in her deposition that she worked ten, fifteen, or twenty hours off-the-clock per week,[75] and Plaintiff Sophia Silva similarly testified that she worked ten to twenty hours off-the-clock per week.[76] Despite their functionally identical *weekly* estimates, on the spreadsheet, Plaintiff Garcia's estimate is listed as *three* hours per *day* and Plaintiff Silva's estimate is listed as *two* hours per *day*.[77] There is no information regarding the basis of or method for calculating these divergent estimates.

---

[71] Dkt. No. 61-1 at 213, ¶ 1.
[72] Dkt. No. 61-7 at 2.
[73] Dkt. No. 32-4 at 23, Campbell Dep. 88:19–25.
[74] Dkt. No. 61-7 at 2.
[75] Dkt. No. 32-5 at 14, Garcia Dep. 50:25–51:10.
[76] Dkt. No. 32-6 at 22, Silva Dep. 81:23–24.
[77] Dkt. No. 61-7 at 2.

- Plaintiff Jorgina Tamplen is included in the list of Plaintiffs for whom "estimates [were] not yet obtained."[78]  However, Jorgina Tamplen provided in her interrogatory response that she "estimates that approximately 25% of the time she spent at the workplace was spent off the clock" though she, like all Plaintiffs,[79] was "unable to give a precise estimate as to how much time she worked off the clock."[80]

These representations are concerning to the Court for several reasons. First, they do not accurately reflect the sworn statements they are purportedly based upon, despite Plaintiffs and Dr. Fox's contentions. They are also misleading. For example, the spreadsheet lists certain Plaintiffs' estimates on a daily basis while listing other Plaintiffs' estimates on a weekly basis,[81] thus making the inclusion of the daily "estimates" for Plaintiffs' who only provided weekly estimates in their sworn responses or testimony particularly misleading. Furthermore, there is no information regarding the basis or the method for calculating the numbers listed in the spreadsheet that differ from the estimates provided by Plaintiffs. The Court is also concerned that any method for doing so would fail to accurately reflect the weekly estimates. Plaintiffs did not necessarily work the same number of days per week,[82] so dividing the weekly estimate by the number of days in a given workweek to "distill" a daily estimate would not accurately reflect Plaintiffs' estimates. Furthermore, because these numbers are not direct reflections of the sworn responses and testimony of Plaintiffs nor calculations made by Dr. Fox, they are necessarily an interpretation and manipulation of the data by Plaintiffs' counsel. By providing this spreadsheet of data interpreted

---

[78] Dkt. No. 61-7 at 4.
[79] See Dkt. No. 61-1.
[80] Dkt. No. 61-1 at 2, ¶ 1.
[81] Dkt. No. 61-7 at 2–3. The spreadsheet contains estimates separated into daily and weekly categories—presumably to reflect the responses and testimony from Plaintiffs who estimated their off-the-clock hours on a daily basis versus those who estimated their hours on a weekly basis, though certain Plaintiffs' weekly estimates were listed as daily, either in clear error or through some undisclosed means of calculating a daily estimate from the weekly estimate provided.
[82] See 69-2 (Fox's Second Amended Report).

and manipulated by Plaintiffs' counsel as the sole source of data for Plaintiffs' off-the-clock work for Dr. Fox's calculations, Plaintiffs' counsel has impermissibly—and unnecessarily—situated himself as a witness in this case.

While these issues are perhaps the most severe, they are not the only problems with the spreadsheet create by Plaintiffs' counsel. Apart from the direct misrepresentations of the estimates in Plaintiffs' sworn statements, there are multiple other instances in which the numbers listed in the spreadsheet are not accurate reflections of Plaintiffs' sworn statements. For example, certain Plaintiffs provided estimates of "average" time worked off-the-clock and while other Plaintiffs provided a range of time.[83] Rather than reflecting the precise numbers given by Plaintiffs or noting whether the number was an average or the high end of a range, Plaintiffs' counsel only included one number for each Plaintiff.[84] Dr. Fox testified in her deposition that she believed the numbers were averages of the amount of off-the-clock time Plaintiffs worked each week and noted differences in her assessment of data when it is a range rather than an average.[85] Because she was only provided with one number per Plaintiff, with no information regarding whether it was an average or a range, she could not account for this in her calculations or her opinion. Furthermore, while a one-hour discrepancy between the average and the maximum number in a range may seem insignificant, where a plaintiff estimated, for example, zero to two hours of off the clock work daily, this difference doubles the plaintiff's damages calculation. By manipulating the data, Plaintiffs' counsel inserted his own bias that Dr. Fox was unable to account for in her calculations.

---

[83] *E.g., compare* Dkt. No. 61-1 at 86, ¶ 1 (La Manna Int.) ("Plaintiff estimates that she worked off the clock on average at least two hours per day") & Dkt. No. 61-1 at 104, ¶ 1 (Little Int.) ("Plaintiff estimates that he worked off the clock on average 1.5 to 2 hours per day.").

[84] *E.g.* Dkt. No. 61-7 at 2 (Angela La Manna: 2; David Brent Little: 2).

[85] Dkt. No. 61-6 at 60–63, Fox Dep. 58:5–22; 61:6–12 ("I mean, they are estimating an average amount, I believe. And so when you use an average, you may be undercalculating some weeks and overcalculating other weeks. But it's an average. So it generally works out at the bottom line.").

12 / 14

Upon review of the records, the Court found a total of eighteen instances in which Plaintiffs' counsel's spreadsheet did not accurately reflect the estimates provided by Plaintiffs in their sworn interrogatory responses or deposition testimony,[86] whether due to outright misrepresentation, omission, error, or some interpretation or manipulation of the underlying data by Plaintiffs' counsel. Accordingly, the Court finds that the spreadsheet created by Plaintiffs' counsel is not a reliable basis for Dr. Fox's opinions.

## 2. The report and testimony of Dr. Fox

The spreadsheet[87] is the sole source for data regarding Plaintiffs' estimated unrecorded off-the-clock work used by Dr. Fox to make her calculations. While facts or data relied upon by an expert do not necessarily need to be admissible,[88] they must be reliable.[89] Furthermore, when an

---

[86] Dkt. No. 61-7 at 2–4 (Hours off the Clock listed as David Brent Little: 1 per day; Leigh Strollis[*sic*]: 2 per day; Todd Piatt: 2 per day; Kathryn Campbell: 1 per day; Paul Mendiola: 2 per day; Sophia Silva: 2 per day; Nancy Garcia: 3 per day; "Hollie (Mardel) Weger:" 0.75 per day; "Marsha Moneyheffer:" 2 per day; Tracy Nolan: 1 per day; Chavita Green: 2 per day; Mary Picardi: 0.5 per day; Valeria Loy: 1.5 per day; Cara Bradford: 2 per day; Sheena McLaurin: 4 per week; Debra Smith: 8 per week; Courtney Warren: 5 ("*Ceased off the clock work in June 2019); Mattie Rogers: 8 per week; and Jorgina Tamplen: no estimate); *compare* Dkt. No. 61-1 at 104 ("Plaintiff [Little] estimates that he worked off the clock on average 1.5 to 2 hours per day."); 195 ("Plaintiff [Strolis] estimates that she worked off the clock on average 1 to 2 hours per day."); 159 ("Plaintiff [Piatt] estimates that he worked off the clock on average 2 hours per week."); 135 ("Plaintiff [Mendiola] estimates that he worked off the clock on average 1-2 hours per day."); 213 ("Plaintiff [Mardel Hollie Weger] estimates that she worked off the clock on average two or three days per week, and she estimates that the total amount of time she worked off the clock was between three or four hours per week."); 38 (Plaintiff [Marsha Collins (Moneyheffer)] estimates that she worked off the clock on average one hour to two hours per day.); 147 ("Plaintiff [Nolan] estimates that she worked off the clock on average 30 minutes to one hour per day."); 62 ("Plaintiff [Green] estimates that she worked off the clock on average one and a half to two hours per day."); 165 ("[Plaintiff Picardi's] best estimate is that she worked off the clock around 2 hours per week but this amount fluctuated and was not always consistent."); 122 ("Plaintiff [McLaurin] estimates that she worked off the clock on average 2 to 4 hours per week."); 189 ("Plaintiff [Smith] estimates that she worked off the clock on average 7.5 to 8 hours per week."); 207 ("Plaintiff estimates that she worked off the clock on average 5 hours per week until sometime in *May or* June of 2019."); 177 ("Plaintiff estimates that she worked off the clock on average 6 to 8 hours per week."); 2 ("Plaintiff [Tamplen] estimates that approximately 25% of the time she spent at the workplace was off the clock but is unable to give a precise estimate as to how much time she worked off the clock."); Dkt. No. 32-3 at 11–12, Loy Dep. 39:2–23 & 42:15–19 (estimating an hour and half daily off-the-clock work while working as "PRN" (pro re nata) and one hour to an hour and a half daily off-the-clock work after transitioning to full-time); Dkt. No. 32-4 at 23, Campbell Dep. 88:19–25 (estimating four to five hours of off-the-clock work per week); Dkt. No. 32-5 at 14, Garcia Dep. 50:25–51:10 (estimating "10, 15, 20" hours off-clock work on a weekly basis); Dkt. No. 32-6 at 22, Silva Dep. 81:23–24 (estimating ten to twenty hours of off-the-clock work per week).

[87] Dkt. No. 61-7.

[88] Fed. R. Evid. 703.

[89] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir.2012).

13 / 14

expert's testimony is "not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's] position," it should be excluded.[90] Here, Dr. Fox relied exclusively on the spreadsheet created by Plaintiffs' counsel as evidence of Plaintiffs' off-the-clock work.[91] As data on Plaintiffs' off-the-clock work is an essential basis for Dr. Fox's calculations and she reviewed no other sources of this data to make her calculations,[92] her opinions are unsupported. For these reasons, the Court finds Dr. Fox's report and proposed testimony in this case unreliable and grants Defendant's motion.[93]

The Court takes a moment to comment on the disservice created by Plaintiffs' counsel. Plaintiffs' counsel took it upon himself to create the facts provided to Plaintiffs' expert when the actual evidence was readily available from Plaintiffs themselves. The time necessary to review the evidence was not overwhelming. The Court itself did so in under an hour. Had Plaintiffs' counsel provided their expert with Plaintiffs' discovery responses and direct testimony, any manipulation of the data would have been proper grounds for impeachment but not necessarily grounds for exclusion. Plaintiffs' counsel bears sole responsibility for the exclusion of Plaintiffs' expert.

### III. CONCLUSION AND HOLDING

For the foregoing reasons, the Court **GRANTS** Defendant's motion and **EXCLUDES** the report and testimony of Dr. Liesl M. Fox, PhD. in their entirety.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 2nd day of September 2021.

_____
Micaela Alvarez
United States District Judge

---

[90] *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir.1996).
[91] Dkt. No. 61-6 at 33, 38, 40–41, 61, & 70, Fox Dep. 31:3-7; 36:12–14; 38:4–8; 39:5–19; 59:13–14; 68:9.
[92] Dkt. No. 69-2 at 4–7.
[93] Dkt. No. 61.