**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| VALERIE LOY, On Behalf of HERSELF and All Others Similarly Situated, | ) ) ) | **COLLECTIVE ACTION** |
| Plaintiffs, | ) ) | **CASE NO. 7:18-cv-00004** |
| v. | ) ) | **JUDGE ALVAREZ** |
| REHAB SYNERGIES, LLC, | ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION AND MEMORANDUM FOR ATTORNEY'S FEES, COSTS, AND EXPENSES**

I.       **INTRODUCTION**

This Fair Labor Standards Act (FLSA) collective action was filed on January 5, 2018.  The case is currently in its fifth year and Defendant Rehab Synergies, LLC has filed a Notice of Appeal which will delay resolution until well into 2023.  Now, having prevailed in a seven-day jury trial, Plaintiffs seek their statutorily mandated fees and expenses through July 8, 2022. Plaintiffs will file a supplemental fee motion upon conclusion of the appeal, assuming the verdict is affirmed by the Appellate Court.

In the four and a half years that this matter has been pending, Plaintiffs' counsel have incurred $1,036,545 in total fees, using rates that counsel have been awarded in the past, including, in the case of Barrett Johnston Martin & Garrison, rates that have been approved by two separate federal judges five years ago in two distinct FLSA collective actions. Plaintiffs' counsel has also advanced $87,251.77 in expenses in this case to date.

Plaintiffs' counsel has scrutinized the time and expenses in this case and has made reductions, as explained in detail below and in the supporting declaration of Jerry Martin, and now ask this Court to award **$1,008,306.75** in fees and **$71,129.17** in expenses.  Plaintiffs' counsel

1

affirmatively makes these reductions in an exercise of billing judgment, to take into account, for example, factors such as time spent working on discovery responses for opt-in plaintiffs who ultimately chose not to participate in trial and all time associated with the report of Plaintiffs' excluded expert.

Plaintiffs have endeavored to be fair, honest, and measured in calculating their fees and expenses and are providing the Court and Defendant with a complete accounting of its billing and expense records.  By preemptively making reductions for work that arguably should be excluded and expenses that are arguably unrecoverable, Plaintiffs hope to avoid unnecessary and unseemly arguments about how much their counsel should be paid in this matter.

Plaintiffs would also note that this case should never have gone to trial and should have settled long ago.  In October of 2021, Plaintiffs' Counsel wrote to Defendant's counsel that "[c]urrently, our lodestar is well in excess of $500,000." *See* 10.13.21 Ltr., attached as **Exhibit A**.  Plaintiffs hoped that pointing out the basic economics of the litigation – *i.e.* that fees and expenses were eclipsing Plaintiffs' potential recovery – would spark meaningful settlement discussion.  But the letter was met with radio silence.   The next month, Plaintiffs' counsel sent another letter to Defendant's counsel, this time making a concrete proposal to settle the case for $475,000 in damages and $400,000 in fees and expenses—which marked a significant compromise from the fees incurred as of that date. *See* 11.19.21 Ltr., attached hereto as **Exhibit B**.

Plaintiffs appropriately valued their case.  They offered to settle their claims for $475,000. Then, four months later, the jury found Defendant liable to every testifying Plaintiff, and the Court ultimately awarded damages of $443,795.34.   And Plaintiffs' Counsel, in a good faith effort to resolve the case, proposed a substantial discount on their fees to bring the case to a conclusion.  But

Rehab Synergies wanted its day in court.  And when that day came, Rehab Synergies lost. Plaintiffs are now entitled to an award of their full fees and expenses.

As this Court knows, preparing and coordinating the testimony of twenty-two Plaintiffs is no small undertaking.  Sixteen Plaintiffs travelled from out of town—some from out of state—to participate at trial.  Plaintiffs' counsel was not only charged with this huge logistical challenge but also the arduous task of thoroughly preparing every Plaintiff for direct and cross examination. The trial ran smoothly and, as the verdict reflects, Plaintiffs were well prepared.  Behind the scenes, considerable effort and money were expended to ensure that Plaintiffs were able to present their proof without any significant glitches.

The complexity of this case was not limited to the trial.  From the outset, the case presented unique challenges. Prior to filing this collective action, Plaintiff Valerie Loy and the Opt-In Plaintiffs from McAllen had initiated a *qui tam* lawsuit filed under the False Claims Act.  The *qui tam* remained under seal during discovery in this matter and this action ran the risk of violating the seal in the FCA case.   As former Attorney General Alberto Gonzalez states in his contemporaneously submitted declaration, litigating a collective action such as this one while a related *qui tam* with an active Department of Justice investigation is pending requires special skill—possessed in this instance by Plaintiffs' counsel.

Simply put, this was a complex case and required the expenditure of enormous resources. And having now prevailed, Plaintiffs' counsel is entitled to the full **$1,008,306.75** and **$71,129.17** in expenses that they seek.

Plaintiffs also respectfully request oral argument on this motion.[1]

---

[1]      Plaintiffs are <u>not</u> requesting an evidentiary hearing or to put on any witnesses.  Plaintiffs simply request the opportunity to address these issues in person before the Court.

## II.    ARGUMENT

### A.    Plaintiffs' Requested Attorneys' Fees of $1,008,306.75 Compensates Plaintiffs Without Producing a Windfall

Under the FLSA, the award of fees and costs to prevailing FLSA plaintiffs is mandatory.[2] But the amount of that award is left to the sound discretion of the district court, based on whether the hourly rates and hours worked by Plaintiffs' counsel were reasonable under the circumstances.

Here, as the prevailing parties, Plaintiffs are petitioning the Court to award attorney's fees totaling **$1,008,306.75** plus expenses of **$71,129.17**.  As the following analysis shows, the total fee sought herein is the product of (1) reasonable billing rates — ranging from $285 to $600 an hour for attorneys and $150 an hour for legal support staff — that are consistent with what attorneys and professional legal staff of comparable skill and experience charge for litigation of this type; (2) 2,736.6 hours reasonably expended by counsel; and (3) efficient staffing of this litigation.

This fee is calculated using the lodestar method, which the U.S. Supreme Court has recognized "as the centerpiece of attorney's fee awards."[3]  Under that method, the court multiplies "the number of hours reasonably expended on the litigation times a reasonable hourly rate."[4]

In exceptional circumstances, courts can then adjust that lodestar amount up or down to account for results obtained and the quality of representation.  In making such adjustments, courts

---

[2]    29 U.S.C. § 216(b) (noting that courts "shall**,** in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and the costs of the action."); *see also Martinez v. Ranch Masonry, Inc*. 760 F. App'x 288, 290 (5th Cir. 2019) (noting that "attorney's fees are mandatory if a defendant violates the FLSA.").

[3]    *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989)).

[4]    *Id*.  (internal quotations omitted).

4

look to the twelve *Johnson* factors.[5]   However, there is a strong presumption that absent exceptional circumstances, the lodestar amount represents a reasonable fee.[6]

As described in greater detail below, Plaintiffs' requested fee is the product of both reasonable rates and reasonable hours, and this lodestar amount should not be adjusted.

### B.    Plaintiffs' Counsel's hourly rates are reasonable and appropriate for a case of this nature.

Plaintiffs' counsel are seeking to be compensated at the following rates for their time spent in this litigation:

| Name | Title | Year admitted to practice | Hourly Rate |
|------|-------|---------------------------|-------------|
| Roberto "Bobby" Ramirez | Partner | 1985 | $600 |
| Jerry E. Martin | Partner | 1999 | $600 |
| David W. Garrison | Partner | 2006 | $485 |
| Scott P. Tift | Partner | 2008 | $425 |
| Seth M. Hyatt | Associate | 2012 | $350 |
| Joshua A. Frank | Associate | 2014 | $285 |
| Litigation Coordinators (Nicole Chanin, Grant Gilbert, Emily Seaborn, Tasha Ellis, Sarah McClenahan, Emily Alexander, Elizabeth Lusnak) | Litigation Coordinator | N/A | $150 |

As reflected above, the highest rates sought for any attorney in this case is $600 per hour, for Jerry Martin and Robert Ramirez. This is the same hourly rate Defendant paid its expert, Dr.

---

[5]      *Produce Pay, Inc v. Amore Produce LLC*, 7:20-cv-00293, 2021 WL 5155715 at *3 (S.D. Tex. McAllen Division, July 21, 2021).  Those factors, articulated in *Johnson v. Georgia Highway Express, Inc.* 488 F.2d 714 (5th Cir. 1974) are as follows:  (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar cases.

[6]      *See, e.g.*, *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993) ("The lodestar, however, is presumptively reasonable and should be modified only in exceptional cases.").

Michael DuMond, who testified about conclusions he had made from his firm's analysis of the company's payroll data. (See March 7th, 2022 Trial Transcript, p. 91 line 14). If Defendant was comfortable paying Dr. DuMond $600 per hour for his services, then it cannot complain too loudly about Plaintiffs' two lead trial lawyers seeking that exact same rate.

Generally, in determining the reasonableness of a requested rate, "the relevant market for purposes of determining the prevailing rate to be paid in a fee award is the community in which the district court sits."[7] The Fifth Circuit, however, has emphasized that in some cases, the complexity and specialized nature of the litigation will require out of town counsel, and that in those cases, counsel's home rates "should be considered as a starting point for calculating the lodestar amount."[8] And Barrett Johnston Martin and Garrison is seeking rates for its attorneys that were approved by two federal judges in FLSA matters five years ago.

As an initial matter, in a complex case such as an FLSA collective action, it is reasonable and appropriate to define the relevant "community" more broadly, rather than limiting it to the specific locality where the courthouse sits. Attorney Justin Strother makes precisely that point in his contemporaneously filed supporting Declaration. Mr. Strother, who is based in Houston (i.e. within the Southern District of Texas) specifically states his opinion that "attorneys with the requisite knowledge and experience to litigate claims on behalf of a multi-plaintiff collective are relatively few and far between" and that "for such cases, it is appropriate to look to the prevailing rates within the district as a whole, rather than at any one city or metro area, as there are unlikely to be enough similar cases filed in any one area to allow for meaningful comparisons." (Strother

---

[7]   *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002) (internal quotations omitted).
[8]   *McClain v. Lufkin Indus., Inc.,* 649 F.3d 374, 382 (5th Cir. 2011); *see also In re Lopez*, 576 B.R. 84, 92 (Bankr. S.D. Tex. 2017) (noting how "[t]he Fifth Circuit determined that out-of-town counsel may be awarded out-of-town rates "under certain limited circumstances.") (internal quotations omitted).

6

Decl. ¶¶ 20-21).  This opinion is based on Mr. Strother's own experience litigating FLSA cases within this district, as well as his experience as a fee arbitrator for the Houston Bar Association. (Strother Decl. ¶¶ 5, 7).  And it is further supported by the fact that none of Defendant's own attorneys in this case are from the McAllen area.  Some are from Austin, some are from Dallas.

Within this District as a whole, and for cases of this kind, the rates that Plaintiffs' counsel are seeking are eminently reasonable.  For example, Mr. Strother notes that he personally charges and has regularly been paid at rates beyond the $600 per hour that Plaintiffs are seeking for Jerry Martin and Bobby Ramirez.  (Strother Decl. ¶ 16).  And in light of his personal experience as a Southern District of Texas litigator, Mr. Strother states that the rates Plaintiffs' counsel are seeking are **all** reasonable given the specific circumstances and demands of this case. (Strother Decl. ¶ 15).

The rates that Barrett Johnston Martin & Garrison are seeking are also reasonable for their home market of Nashville.[9]  In fact, the rates that the firm is seeking for its attorneys have been expressly approved ***for those specific attorneys,*** as well as for litigation coordinators/paralegals by two different federal judges in FLSA litigation in the Middle District of Tennessee.  (*See* contemporaneously submitted Declaration of Jerry Martin ("Martin Decl.") ¶¶ 15-17) (describing fee awards in *Paine v. Intrepid*, No. 3:14-cv-2005 (M.D. Tenn. Jan. 6, 2017) and *Flatt v. LHC Group, Inc., et al.*, No. 2:16-cv-14 (M.D. Tenn. Mar. 1, 2017)).  And the court approved these rates more ***than five years ago***.  (Id.).[10]   Defendant cannot seriously dispute that rates that were approved as reasonable by federal judges in 2017 are now somehow unreasonable for those same attorneys, in the same type of litigation, in 2022.

---

[9]     *See McClain*, 649 F.3d at 382 (noting that in cases where the court concludes that it is reasonable to obtain out-of-market counsel "the co-counsel's 'home' rates should be considered as a starting point for calculating the lodestar amount").

[10] Copies of the relevant fee orders are attached as exhibits 2 and 4 to Attorney Martin's Declaration.

Defendant may point to the State Bar of Texas' survey of hourly rates as a basis to reduce the rates sought here.  However, the State Bar of Texas has completely discontinued collecting and publishing rate information and now asserts on its website: "Past hourly rate reports were not designed for nor intended to be used for setting appropriate attorney fees. Other factors should be considered in determining attorney hourly rate fees that are outside the scope of these reports."[11] In light of this admonition by the State Bar on the utility of their own past surveys in ascertaining fee awards, any reliance on them to evaluate Plaintiffs' fee request in this case is misplaced.

### C.   The Fifth Circuit's *Johnson* factors strongly support an award of rates at the high end of what is reasonable.

Within any legal market, there will be a range of "prevailing" rates, even between attorneys with similar amounts of experience.[12]  And courts will often look to the Fifth Circuit's *Johnson* factors to determine what specific rates to award within that range of reasonableness.[13]  In this case, the *Johnson* factors clearly support an award of rates at the upper end of what is reasonable. While not all twelve factors are relevant to the rate analysis in this case,[14] several are directly on point and speak to why Plaintiff's counsel are entitled to the rates that they seek.

---

[11]  https://www.texasbar.com/AM/Template.cfm?Section=Demographic_and_Economic_Trends (last accessed on July 14, 2022).

[12]    *Johnson*, 488 F.2d at 718 ("It is open knowledge that various types of legal work command different scales of compensation.")

[13]    *Id*.

[14]    Some of the *Johnson* factors speak more to the reasonableness of the hours worked—*e.g.* "the time and labor required"— than the requested rate.  The reasonableness of the hours Plaintiffs' counsel are seeking is addressed later in Plaintiffs' brief.

### 1. The amount involved and the results obtained.

The first and most important of the *Johnson* factors in this instance is the "amount involved and the results obtained."[15]  In this case, Plaintiffs' counsel took an FLSA collective to trial on behalf of more than twenty plaintiffs, ***all*** of whom had to appear and testify in order to be eligible to recover damages.   And the jury not only found Rehab Synergies liable as to every testifying plaintiff, it found the company's conduct to be willful, extending the applicable statute of limitations by one year and entitling every testifying plaintiff to liquidated damages, for a total recovery to the collective of $443,795.34. (Dkt. 173).  This is, quite simply, an exceptional result.

Attorney Peter Winebrake—whose firm has represented workers in more than 200 class and collective actions—concurs.  In his contemporaneously filed declaration, he notes that FLSA collective actions very rarely go to trial.  (Winebrake Decl. ¶ 14).  And in those that do, there is a significant amount of "behind the scenes" work and client "hand-holding" that must happen to ensure that the plaintiffs who testify are "prepared both in advance of trial and upon their arrival at the town in which the courthouse is located."  (Winebrake Decl. ¶ 15).  In short, when such cases go to trial, they are time and resource intensive, in addition to being difficult.  In fact, Attorney Winebrake notes in his declaration that of the 200+ FLSA class and collectives his firm has litigated, only two went to trial, and both of those resulted in defense verdicts.  (Winebrake Decl. ¶ 14).  There can be no real dispute then that taking an FLSA collective action to trial and winning is a great result in and of itself—all the more so when the jury finds for every testifying plaintiff and further finds that Defendant's violation of the law was willful.  Such a result justifies an award of hourly rates at the very top of the reasonableness scale.

---

[15]    *Johnson*, 488 F.2d at 717-18.  Courts have repeatedly noted that among the *Johnson* factors, "the most important factor is the 'degree of success obtained' by the prevailing party." *Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 793 (S.D. Tex. 2009).

**2.     The skill required and the novelty and difficulty of the questions.**

Two other *Johnson* factors that justify an award of rates at the high end of what is reasonable are the "novelty and difficulty of the questions" and "the skill required to perform the legal service properly."[16]

FLSA collective actions are inherently complex and difficult.  (See Strother Decl. ¶ 20) ("Many attorneys do not possess the requisite skills or knowledge to successfully pursue or manage complex civil litigation such as an FLSA collective action."); (See also Winebrake Decl. ¶ 15) ("Successful representation of an FLSA requires time and skill and can be a large burden for a small firm."). And given that so few of them ever proceed to trial, any collective action that does go to trial will necessarily involve at least some degree of novelty.

Here, however, there was another variable in play that made this case complicated even for an FLSA collective action.  Specifically, Plaintiffs' counsel had to contend with a parallel *qui tam* action filed under the federal False Claims Act by several of the plaintiffs in this case, that was still pending under seal during much of this litigation.  In support of this point, Plaintiffs are contemporaneously filing the declaration of former Attorney General Alberto Gonzales ("Gonzales Decl.").  From his experience as head of the U.S. Justice Department—the federal agency tasked with investigating *qui tam* actions—Attorney General Gonzales knows of the pitfalls that can arise when a sealed FCA case and an unsealed wage and hour case proceed in tandem against the same defendant based on similar alleged conduct.  (Gonzales Decl. ¶ 17).  As Attorney General Gonzales testifies "[t]here was potential for this parallel action to run afoul of the seal in the FCA qui tam case and complicate the ongoing DOJ investigation" (id. ¶ 19), and, more specifically, that the complaint had to be drafted such that the allegations did not divulge any

---

[16]     *Johnson*, 488 F.2d at 717-18.

"details that might suggest the existence of a parallel qui tam action" (id. ¶ 19) and that counsel had to "respond to discovery without breaching the seal or otherwise jeopardizing the Government's investigation." (Id. ¶ 21).

There are not many firms that have the necessary range of experience to successfully manage an FLSA collective action while also steering clear of the pitfalls that arise when such actions proceed in parallel to a sealed *qui tam*. But Barrett Johnston Martin & Garrison is one such firm. In addition to its significant wage and hour practice, the firm also regularly represents FCA whistleblowers, and has had considerable success in that area of law. *See, e.g.,* Gonzales Decl. ¶ 24 ("I understand that in 2021 Mr. Martin and Mr. Hyatt represented the relator in the largest qui tam recovery in the country that year, resulting in a $160 million settlement, which I also understand is the largest FCA recovery to date in the history of the Middle District of Tennessee."). Moreover, given Attorney Martin's own experience serving as a United States Attorney, he has first-hand knowledge of how FCA cases work—from both the government and the whistleblower's perspective—that allowed him to effectively dialogue with government attorneys in the parallel *qui tam* here, to ensure that neither case interfered with the other. (Gonzales Decl. ¶ 21) (noting how "Plaintiffs' counsel in this Collective Action regularly communicated with the Department of Justice to ensure that developments in the Collective Action did not adversely impact the *qui tam* action of the government's investigation.").

The difficulty in managing such actions, and the skill required to do so is yet another reason why Plaintiff's counsel is entitled to rates at the high end of the reasonableness scale for this case.

### 3. Contingency Fees Favor the Award of Comparatively Higher Rates

Plaintiffs' counsel in this case have agreed to be compensated on a contingent fee basis. As part of their agreement with Plaintiffs, Plaintiffs' counsel has agreed not only to advance all

time associated with prosecuting this case to completion, but also to advance all expenses required to prosecute this litigation.  Here, counsel for Plaintiffs have invested approximately one million dollars in billable time—including amounts that are being affirmatively written off—and more than $87,251,77 in expenses—including, again, amounts that are being affirmatively written off—to successfully prosecute this case for the Plaintiffs—all on a contingent basis.  Plaintiffs' counsel have forgone other opportunities over the past four and half years, some likely to be more lucrative, in order to devote the time and resources necessary to bring this matter to trial and prevail.

Plaintiffs' counsel in this case, Barrett Johnston Martin and Garrison and the Ramirez Law Firm, accept the vast majority of their cases on a contingent risk basis – expecting no payment of the firms' fees or costs unless they prevail in the litigation.  (See Martin Decl. ¶ 18) ("The vast majority of the work that I do is on a contingency basis.").  As a result, Plaintiffs' counsel can work on some cases for years without payment and with the risk that they will be paid nothing if they lose.  Therefore, it is vital to their practice to recover their full lodestar and all expenses when they prevail. If Plaintiffs' counsel could not obtain such recoveries when successful, they could not afford to accept and litigate employment cases at all, which would defeat the basic purpose of the FLSA's fee shifting provisions.

To be clear, Plaintiffs are not asking this Court for a lodestar **_enhancement_** based on the contingent nature of their representation.[17]  But it is certainly a factor that further supports the award of hourly rates at the upper end of the reasonableness spectrum as **_part of the lodestar calculation_**—particularly given the size of the risk Plaintiffs' counsel assumed in having to litigate this case for so many years, and at significant expense, without any assurance of payment.

---

[17]     The Fifth Circuit has indicated that in light of Supreme Court precedent, enhancements above the lodestar amount to account for contingent fee agreements may not be permissible. *Shipes v. Trinity Indus.*, 987 F.2d 311, 323 (5th Cir. 1993).

For all these reasons, Plaintiffs have more than demonstrated that the rates they seek—
while perhaps high for the McAllen Division—are eminently reasonable and justified under the
specific facts and circumstances of this case.

**D.      Plaintiffs' counsel performed a reasonable and necessary amount of work
          representing Plaintiffs in this matter.**

Once the Court establishes the reasonable hourly rates for prevailing party's counsel, the
second half of the lodestar analysis is determining the number of hours reasonably expended.[18]
To establish that the hours expended were reasonable, the prevailing party must submit evidence
supporting the hours worked and the exercise of "billing judgment."[19]

**1.      The 2,736.6 hours that Plaintiffs' Counsel expended in litigating this
          action has been reasonable.**

Here, Plaintiffs' counsel have submitted detailed records for all 2,736.6 hours worked to
date,[20] demonstrating that these hours were reasonably expended.  Specifically, these detailed
billing records are attached as exhibits to the contemporaneously filed declarations of Jerry E.
Martin, and Roberto "Bobby" Ramirez. Additionally, as set forth below, the complexity of the
issues involved in this case, combined with the time and labor that Plaintiffs' counsel had to expend
as a result of Defendant's unwillingness to compromise, (*i.e. Johnson* factors 1 & 2), further
demonstrates that the time spent in litigating this case has been reasonable.

To assist the Court in its analysis, the Declaration of Jerry Martin contains a table breaking
down the 2,539.40 hours expended by Barrett Johnston Martin and Garrison in this case into the

---

[18]     *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983).

[19]     *Saizan v. Delta Concrete Prod. Co.*, 448 F.3d 795, 799 (5th Cir. 2006) ("plaintiffs seeking
attorney's fees are charged with the burden of showing the reasonableness of the hours billed and,
therefore, are also charged with proving that they exercised billing judgment.").

[20]     Given that there is an appeal of this action pending, Plaintiffs reserve the right to submit a
supplemental brief requesting additional fees after they prevail in that appeal.

seven broad phases of litigation.  (Martin Decl. ¶ 21).[21]  For the Court's convenience that table is reproduced here.

| Case Phase – general description of principal activities | Date Range covered | Total Hours Worked (as reflected in BJMG billing records) | Total Fees Accrued (prior to accounting for any deductions) |
|---|---|---|---|
| Pre-Suit Investigation, Drafting, and Filing Complaint | 8/28/17 - 1/5/18 | 74 | $33,934.20 |
| Initial Case Management, Discovery and Briefing Conditional Certification | 1/6/18 – 4/3/19 | 470.1 | $200,930.78 |
| Notice Period and Opt-in Discovery,    Mediation, Expert Discovery | 4/4/19 – 3/2/21 | 420.7 | $144,099.49 |
| Briefing    Dispositive motions    and    pre-trial motions    and    developing pre- trial order | 3/3/21 – 12/31/21 | 446.2 | $168,966.29 |
| Pre-Trial Preparation | 1/1/22 – 2/27/22 | 593.3 | $232,426.54 |
| Trial | 2/28/22 – 3/8/22 | 318 | $134,460.71 |
| Post-Trial work, including fee petition work through July 8, 2022 | 3/9/22 – 7/8/22 | 217.1 | $90,658.76 |

The work performed during these seven phases has all been reasonable and necessary for advancing this case.  And a disproportionately large amount of it—more than 1,000 hours—could

---

[21]    Attorney Martin's Declaration also contains a table showing, for each Barrett Johnston attorney and for the firm's litigation coordinators, the (1) hourly rate being sought; (2) the number of hours worked (as reflected in the billing records), and the total fee that results from multiplying that rate by those hours. (Martin Decl. ¶ 22).

have been avoided entirely if Defendant had been willing to seriously negotiate and consider resolution.

The first phase of the case, consisting of pre-suit investigation, drafting, and the filing of the complaint, is an inherent part of any employment litigation.  Moreover, the fees accrued for these case initiation activities work out to only $33,934.20,[22] a small fraction of the total fee request.

The second phase of the case—which revolved around pre-certification discovery and briefing conditional certification and notice—was similarly reasonable and necessary to the litigation.  Named Plaintiff Loy would never have been able to pursue this action on a collective basis had she not prevailed on her certification motion.  And before Plaintiffs were even able to file that motion, they engaged in significant pre-certification discovery.  That included responding to written discovery served on Plaintiff Loy and the four pre-notice opt ins, reviewing documents produced by Defendant in response to Plaintiff's written discovery, defending the depositions of the five plaintiffs, and taking the depositions of Defendant witnesses Jennifer Maya, Jubenal Garcia, Maurice Caceres, Carmen Vitton, and 30(b)(6) designee Melissa Collier.   After vigorous litigation Plaintiff did ultimately prevail, and this Court granted conditional certification on April 3, 2019.  (Dkt. 35).  Given the amount of discovery and briefing that Plaintiffs had to complete, the 470.1 hours expended during that phase of the case was eminently reasonable.

The third phase of the case, which was focused on administering notice, engaging in post-certification discovery, and ultimately mediation, was run and staffed efficiently by Plaintiffs' counsel, and the hours expended were reasonable.  While this phase of discovery did not involve

---

[22]     The dollar amounts stated in this chart do not factor in any of affirmative write-offs that Plaintiffs' counsel are making.

any additional fact witness depositions,[23] Defendants did serve written discovery on every Plaintiff who opted in.  Working with opt-in Plaintiffs to respond to these discovery requests was a time-consuming process and, even without the deductions Plaintiffs are taking to account for time spent working with opt-ins who ultimately did not proceed to trial, the 420.7 hours spent during this phase of trial was both reasonable and necessary.

During the fourth phase of the case, Plaintiffs responded to numerous motions filed by Defendants—including motions for partial summary judgment, decertification, and bi-furcation of trial into a liability and damages phase.  Given that these were all Defendant's motions, it was obviously reasonable for Plaintiffs to expend time briefing them and fighting them back.  Time spent on pre-trial motions *in limine*, witness and exhibit lists, and the proposed pre-trial order was similarly reasonable—as Plaintiffs were simply working to meet the pre-trial deadlines imposed by the Court in its scheduling order.  It is also not surprising that such pre-trial planning in this case was somewhat more involved, as trying an FLSA collective action involves a myriad of legal and logistical questions that are simply not present in other cases—questions that range from who has to be at court on what days, to more complex evidentiary questions regarding how to structure the jury's verdict form in a way that is legally sound but still short enough not to be confusing. Given that the trial in this case was estimated to last for as much as two weeks but only took seven days, Plaintiffs submit that the time devoted to thinking through all of these issues in advance was time well spent and resulted in an efficient trial that did not waste the time of either the jury or the Court.

---

[23]    Plaintiffs did depose Defendant's expert Dr. Michael DuMond during this phase of the case.  Plaintiffs also defended the deposition of their proffered expert, Dr. Liesl Fox.  However, Plaintiffs are not seeking compensation for any time or expense relating to Dr. Fox's deposition, given that the Court ultimately excluded Dr. Fox and her report.

The above analysis only breaks down the 2,539.40 hours expended by Barrett Johnston Martin and Garrison.  Bobby Ramirez, who expended a total 197.20 hours in this litigation, was brought onto the litigation team once it appeared to Plaintiffs' counsel that Defendants were likely to take the case to trial.  As a result, Attorney Ramirez's hours are overwhelming related to trial preparation and to the actual trial of this case.  To jump into a case that had been underway for over three years and expend just under 200 hundred hours getting up to speed, preparing for trial, and participating in seven days of trial is reasonable and justified.  Mr. Ramirez played an integral role in this case including picking the jury, helping coordinate witnesses, and preparing witnesses for trial.  (See Ramirez Dec. ¶¶ 6-11).

Of course, much of this time—as well all 1,128.4 hours expended by Barrett Johnston during phases five, six, and seven—could have been avoided had Defendant had any interest in reaching a reasonable resolution.  As early as October 2021, Plaintiffs' Counsel wrote to Defendant that Plaintiffs' attorneys fees were already above $500,000, and would increase dramatically as the case moved into final trial preparation.  *See* attached Exhibit A ("Because we are not using representative proof due to your client's opposition to it, I believe our lodestar will begin to **significantly** increase starting in November.") (emphasis in original).  It was Plaintiffs' hope that this letter would open the door to a renewed dialogue about the possibility of settlement, as no such dialogue had occurred since mediation ended unsuccessfully in November of 2020.

When Plaintiffs' October letter failed to generate any response from Defendants, Plaintiffs sent another, more explicit demand letter in November.  In that letter, Plaintiffs noted that "a resolution prior to the end of December . . . is worth a considerable reduction to our current but rapidly growing lodestar."  See attached Exhibit B.  Accordingly, Plaintiffs offered to resolve the case for a total of $875,000 ($475,000 in damages, $400,000 in fees) if Defendant was prepared

to accept before the end of November.  Defendant asked that Plaintiff keep this offer open several additional weeks due to the Thanksgiving holiday, and Plaintiffs agreed.  However, the only counter Defendants ever made was $150,000 in damages, and $200,000 in fees.  At such a late stage of the litigation with so much already incurred in fees, this was not a serious counter.  And, as the jury's verdict would come to show (roughly three times as much as Defendant's highest offer), Plaintiffs' assessment as to the relative risk and value of the case as of late 2021 was *far* more accurate than Defendant's.

Defendant, of course, was fully entitled to have its day in court.  And, for better or worse, it got what it wanted.  But such choices carry risks.  And because of defendant's choice to fight rather than compromise, Plaintiffs have had to spend more than 1,000 extra hours (and counting) to secure the same basic relief they would have agreed to take in November of 2021.  And that intransigence has continued even after the jury rendered its verdict.  Well in advance of filing this fee application and with the hope of avoiding it entirely, Plaintiffs' counsel voluntarily provided information to Defendant's counsel about the hours expended, rates, expenses and rough estimates of the amount they intended to seek in fees and expenses.  Defendant has not made any counter proposal, suggested a path to resolving fees and expenses, or otherwise responded in any meaningful way.  (Martin Dec. ¶ 34). Defendant is of course not obligated to negotiate, but the Court should take that into consideration in awarding Plaintiffs their fees and expenses

A reasonable attorney's fee award—and particularly the determination of what hours were reasonably expended—must take into account whether the defendant mounted an aggressive defense.  As early as 1977, the Fifth Circuit noted "[o]bviously, the more stubborn the opposition,

the more would be required."[24]  And other courts, including the Supreme Court, have echoed this same basic point.[25]

Based on the needs of the case and the defense mounted by Defendant, the hours for which Plaintiff's counsel is seeking compensation are plainly reasonable.

### E.   Plaintiffs are entitled to an award of $71,129.17 for their reasonable costs and expenses.

In addition to their attorney's fees, Plaintiffs are also seeking $71,129.17 in expenses. Federal Rule of Civil Procedure 54 provides for the award of certain costs to any prevailing party. The specific costs that a Plaintiff may recover under Rule 54 are those categories of costs specifically set forth under 28 U.S.C. § 1920, and include such items as copying costs, deposition transcript costs, and filing fees.  Under the fee shifting provision of the FLSA, however, courts are permitted to go beyond the limits of § 1920 and to include "litigation expenses" as part of the reasonable attorney's fee.[26]

In this case, a disproportionately large amount of the litigation expenses incurred by Plaintiffs' counsel have been for travel, lodging, and meals for both the trial team and the plaintiffs

---

[24]      *Wolf v. Frank*, 555 F.2d 1213, 1217 (5th Cir.1977)

[25]      *City of Riverside v. Rivera*, 477 U.S. 561, 580-81 n.11 (1986) ("The [defendant] cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response") (internal citation omitted); *see also Frank Music Corp. v. MGM, Inc.*, 886 F.2d 1545, 1557 (9th Cir. 1989) ("Although [defendants] had the right to play hardball in contesting [plaintiffs'] claims, it is also appropriate that [defendants] bear the cost of their obstructionist strategy") (internal quotations omitted); *Blake v. Balt. Cty.*, 12 F. Supp. 3d 771, 777 (D. Md. 2012) ("'Those who elect a militant defense are responsible for the time and effort they extract from their opponent. A party cannot litigate tenaciously and then complain about the time spent by the opposing party in response.'") (quoting *Imgarten v. Bellboy Corp.*, 383 F. Supp. 2d 825, 840 (D. Md. 2005)).

[26]      *See, e.g.*, *Rouse v. Target Corp.*, 181 F. Supp. 3d 379, 392 (S.D. Tex. 2016) ("Accordingly, in addition to taxable court costs listed under 28 U.S.C. § 1920, costs for travel, meals, lodging, photocopying, long-distance telephone calls, computer legal research, postage, courier service, mediation, exhibits, document scanning, and visual equipment litigation expenses are  also recoverable under the FLSA as part of an attorney's fee award.").

who had to be at court to testify.  These expenses are all itemized in the billing records attached as Exhibit 1 to Jerry Martin's Declaration.

      **F.**      **The fee and expense award Plaintiffs' Counsel is requesting is the result of sound billing judgment.**

Plaintiffs take seriously the Supreme Court's instruction that attorneys seeking fees should exercise "billing judgment."[27]  Accordingly, Plaintiffs' counsel is not seeking to be awarded the full value of the time and expenses reflected in their billing records.  Instead, in an exercise of sound billing judgment, Plaintiffs' counsel is affirmatively writing off fees and expenses in four different categories, all of which described in the Declaration of Jerry Martin.

First, for fees or expenses that relate to either the expert report/deposition of Dr. Liesl Fox, or time spent on work that was purely for an opt-in Plaintiff who was dismissed out prior to trial or who ultimately chose not to attend trial, Plaintiff's counsel is not seeking *any* reimbursement. This category also includes any distinct expense entry for a travel or lodging upgrade for the convenience of counsel.  These deductions are reflected by **yellow** highlighting in the billing records of Barrett Johnston Martin and Garrison.  The total value of these deductions is $28,083.43 — $16,760.00 of which is deducted from fees, $11,323.43 of which is from expenses.

Second, for fees relating to time spent responding to post-notice opt-in discovery Plaintiffs are only seeking 65% of the amounts reflected in the bill.  Plaintiffs' counsel worked on discovery responses for 26 opt-in plaintiffs during this period.  However, of those 26, only 17 ultimately attended trial.  Accordingly, given that 17 is approximately 65% of 26, Plaintiffs are only seeking 65% of the value of time entries highlighted green in the bill.  These deductions are reflected by

---

[27]    *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

**green** highlighting in the billing records of Barrett Johnston Martin and Garrison. The value of these deduction is $11,478.25.

Third, for expenses relating to certain trial meals, and in one instance an attorney flight change.  Plaintiffs are affirmatively deducting 50% of the expense, to account for any add-ons and upgrades that may have resulted in higher charges that Plaintiffs do not expect Defendant to reimburse (e.g. wine or dessert with a meal).  These deductions are reflected by **pink** highlighting in the billing records of Barrett Johnston Martin and Garrison. The total value of these deductions is $1,440.88.

Fourth, and finally there are two significant expense entries relating to the room costs for attorneys and Plaintiffs during trial for which Plaintiffs are only seeking 75% of the incurred expense.  Plaintiffs voluntarily deduct 25% from these two expense entries, to account for any upgrades or room charges that may have been added to the charges for the rooms themselves or for any hotel restaurant charges that included items such as appetizers, desserts or similar items that Plaintiffs do not expect Defendant to reimburse.  These deductions are reflected by **blue** highlighting in the billing records of Barrett Johnston Martin and Garrison The total value of these deductions is $3,358.29.

In short, through an exercise of billing judgment, Plaintiffs' counsel is voluntarily writing off $44,360.85 in fees and expenses that are contained within their billing records.  These voluntary deductions further support that the fees and expenses Plaintiffs are seeking are reasonable.

### G.    Plaintiff's Counsel Requests that $5,000 from the fee award be designated as an incentive payment to Named Plaintiff Loy.

As a final point, Plaintiffs' counsel respectfully requests that $5,000 from the fee award be set aside and designated by the Court as an incentive payment for named Plaintiff Loy.

Such incentive payments have been approved in numerous class and collective settlements within this circuit, to compensate the named plaintiff "for the costs they incurred to participate in this litigation, including travel charges, notary charges, and lost wages resulting from court appearances, interviews, and depositions."[28]  In this case, of course, there was no settlement, and the jury was not authorized to award an incentive payment as part of its verdict. Accordingly, it makes sense that such payment be made now—taken from and as part of the attorney fee award.

Awarding this $5,000 payment to Ms. Loy will not prejudice any other party.  Defendant will not have to pay any additional money to cover it, nor will the other Plaintiffs in this action receive any less money from their respective shares of the $443,795.34 judgment.  Plaintiffs' counsel are the only ones who will end up with less money due to this allocation.  And Plaintiffs' counsel is more than happy to see their award reduced by $5,000 in order to compensate Ms. Loy for her time and effort in this litigation.

Unlike named plaintiffs in cases that settle before trial (i.e. the vast majority of class and collective actions that survive dispositive motions and motions to decertify), Ms. Loy not only had to take time away from her job and family to meet with attorneys, respond to discovery, and sit for a deposition.  She also had to attend seven days of trial—and to be prepared to attend at least two weeks of trial, as it was not possible to know with any real certainty how quickly the parties would present their proof until the trial got started.

Allowing named plaintiffs to receive incentive payments when a case settles, but not when Plaintiffs prevail at trial, would also create perverse incentives.  It would encourage named

---

[28]    *Quintanilla v. A & R Demolition Inc.*, No. CIV.A. H-04-1965, 2008 WL 9410399, at *3 (S.D. Tex. May 7, 2008) (approving $1,000 incentive payment in FLSA settlement and collective cases from within the fifth Circuit showing incentive payments to class and collective named plaintiffs, ranging between $1,000 to $10,000).

plaintiffs to push for settlement to maximize their own financial interests, regardless of whether the specific settlement agreement is truly in the best interests of the collective.

In order to avoid such perverse incentives, and to compensate Ms. Loy for the time and effort she has expended on behalf of the other therapists and therapy assistants she has represented in this case, designating $5,000 from any fee awarded by this Court to Ms. Loy is only fair, and is eminently reasonable.

III.    **CONCLUSION**

For all these reasons, Plaintiffs request that this Court grant their motion, and award Plaintiffs' counsel a total of **$1,008,306.75** in fees –with $5,000 of that fee award expressly allocated as an incentive payment for Ms. Loy—and **$71,129.17** in expenses in this case.


Date: July 15, 2022                              Respectfully submitted,

                                                 */s/ Jerry E. Martin* w/ permission of Attorney-in-Charge
                                                 **JERRY E. MARTIN (No. 20193) ***
                                                 **DAVID W. GARRISON (No. 24968) ***
                                                 **SETH M. HYATT (No. 31171) ***
                                                 Of Counsel
                                                 BARRETT JOHNSTON
                                                 MARTIN & GARRISON LLC
                                                 414 Union Street, Suite 900
                                                 Nashville, TN 37219
                                                 Telephone: (615) 244-2202
                                                 Facsimile: (615) 252-3798
                                                 Email jmartin@barrettjohnston.com
                                                 Email dgarrison@barrettjohnston.com
                                                 Email shyatt@barrettjohnston.com

                                                 * Admitted *Pro Hac Vice*

                                                 **CHARLES S. SIEGEL**
                                                 Attorney-In-Charge
                                                 Texas Bar No. 18341875

WATERS KRAUS & PAUL
3141 Hood Street, Suite 700
Dallas, TX 75219
Telephone: (214) 357-6244
Facsimile: (214) 357-7252
Email siegel@waterskraus.com

**ROBERTO L. RAMIREZ**
Texas Bar No. 16506700
Southern District ID No. 5956
THE RAMIREZ LAW FIRM, PLLC
820 E. Hackberry Ave. McAllen,
Texas 78501
Telephone: 956.668.8100 Facsimile:
956.668.8101
rr@theramirezlawfirm.com

*Of Counsel:*

**WM. PAUL LAWRENCE, II**
Texas Bar. No. 24004130
WATERS KRAUS & PAUL
3141 Hood Street, Suite 700
Dallas, TX 75219
Telephone: (214) 357-6244
Facsimile: (214) 357-7252
Email plawrence@waterskraus.com

**CAITLYN E. SILHAN**
Texas Bar No. 24072879
WATERS KRAUS & PAUL
3141 Hood Street, Suite 700
Dallas, TX 75219
Telephone: (214) 357-6244
Facsimile: (214) 357-7252
Email csilhan@waterskraus.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Plaintiffs' Motion and Memorandum for Attorney's Fees Costs and Expenses* was filed electronically with the Clerk's office by using the CM/ECF system and served upon the parties as indicated below through the Court's ECF system on July 15, 2022:

**Derek T. Rollins**
Attorney-In-Charge
Texas Bar No. 24058079
Federal ID No. 820720
**Erika L. Leonard**
Texas Bar No. 24110740
**Jasmine Harding**
Texas Bar No. 24101865
**Bruce A. Griggs**
Texas Bar No. 08487700
OGLETREE DEAKINS NASH
SMOAK & STEWART, P.C.
301 Congress Avenue, Suite 1150
Austin, Texas 78701
Telephone: (512) 344-4700
Facsimile: (512) 344-4701
derek.rollins@ogletree.com
jasmine.harding@ogletree.com
bruce.griggs@ogletree.com
erika.leonard@ogletree.com

**John B. Brown**
Texas Bar No. 00793412
OGLETREE DEAKINS NASH
SMOAK & STEWART, P.C.
8117 Preston Road, Suite 500
Dallas, Texas 75225
Telephone: (214) 987-3800
Fax: (214) 987-2927
John.brown@ogletree.com

*/s/* Jerry E. Martin
JERRY E. MARTIN